Filed 8/30/13  P. v. Shaw CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

      Plaintiff and Respondent,

v.

MELVIN LOUIS SHAW,

      Defendant and Appellant.

E053697

(Super.Ct.No. SWF022580)

OPINION

APPEAL from the Superior Court of Riverside County.  Albert J. Wojcik, Judge.  Affirmed.

Kristin A. Erickson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Peter Quon, Jr., Susan Miller, and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant Melvin Shaw was convicted of first degree murder (Pen. Code, § 187, subd. (a).[1]) He was sentenced to state prison for 25 years to life. He appeals, contending the evidence does not support a finding of premeditation and deliberation and the trial court erred in excluding expert testimony regarding posttraumatic stress disorder (PTSD).

## I. FACTS

### A. The Prosecution's Case

In the summer of 2007, defendant was living with Elisa Lopez, a technician at Menifee Valley Medical Center. On July 21, Lopez did not show up for work, and a coworker, Bobbi Garrison, called defendant to inquire. Defendant told Garrison that he and Lopez had a fight because he came home drunk and missed their "date night." Defendant had fallen asleep in the loft, and when he woke up, Lopez was not there. Defendant asked if Garrison knew where Lopez was or who she was with. She told him to call the police. Garrison tried calling Lopez's cell phone many times but there was no answer. About 10:45 a.m., Garrison went to Lopez's home and found both of her cars there. Garrison knocked on the door and rang the doorbell, and when no one answered, she entered the house through an unlocked door. She went to the master bedroom and noticed the bed had been completely stripped of bedding. Not finding Lopez, Garrison left.

Defendant called 911 at approximately 11:00 a.m. to report that his girlfriend had not come home the night before. Corporal Steven Whittington of the Murrieta Police

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

Department responded to the call. Defendant explained how he came home "reeking of beer" to find Lopez sitting on the couch "upset" with him for forgetting their date night. Defendant claimed there was no yelling or physical act of violence. Defendant said he admitted screwing up and claimed he wanted to go out but needed to lie down first. He woke up about 2:00 a.m. and found that Lopez was not home, and the bed in the master bedroom was still made. Defendant thought she had been called into work, so he went into the master bedroom and lay down on top of the covers. He woke up about 7:15 a.m. Lopez was still not home. About 7:30 a.m. defendant called a friend to take him to pick up his truck. Although defendant noticed one of Lopez's cars in the driveway, he did not look in the garage to see if the other car was there. After picking up his car, defendant went to a meeting at the Temecula Middle School where he coached Pop Warner football. While there he received a call from Garrison. After the meeting, defendant went home and called 911.

Defendant appeared nervous as he was talking to Officer Whittington, and beads of sweat were dripping down his forehead. When the officer asked defendant whether his drinking the night before had affected his memory, defendant said, "'I wasn't plastered or anything; I just had a buzz.'" The officer walked around the house. The clothes dryer was running and there were items inside. The bed in the master bedroom was made and there was no indentation or creasing of the comforter or pillows as there would have been if someone had been sleeping on top of it. Defendant said the bed had been like that all night. Defendant did not know where Lopez's purse was. Officer Whittington left the

3

house at approximately 1:00 p.m. to return to the police station, where he filled out a missing person's report.

Later that afternoon, Garrison called defendant again. Defendant was crying and stated he was worried something had happened to Lopez. Garrison returned to Lopez's home. Defendant was "acting upset," but Garrison did not think it was genuine. She noticed the bed in the master bedroom had been made. Garrison obtained Officer Whittington's number and called him. She told the officer that Lopez had never missed work, the bed in the master bedroom was not made when she had first gone to the house, and that she found it odd that the bed was made when she returned.

After talking to Garrison, Officer Whittington and two other officers went back to defendant's house about 3:15 p.m. When they arrived, defendant delayed answering the door. He claimed he had been upstairs taking a nap. He appeared nervous and was sweating. The officers searched the house.

In the home office next to a computer, officers found a black purse with a wallet containing Lopez's driver's license and credit cards. The purse had not been there when Officer Whittington searched the house earlier that day. Inside the laundry room were numerous white bathroom hand towels. Two of the towels had red marks that appeared to be blood. Inside the dryer were a bed sheet and a tank top. In the garage was a wet mop and bucket, which were not there during the earlier search. A large clump of long, brown hair was in the mop. Inside the master bedroom officers found two bags from Linens 'n Things, containing a bed comforter still in its packaging and three tags for towel bars. The bags had not been inside the master bedroom when Officer Whittington

4

previously searched. On the floor near the edge of the bed was a large clump of hair similar to that which was on the mop. In a trash can in another bathroom on the second floor, Officer Whittington found white gauze with a "pretty good amount" of what appeared to be blood on it. During the search, the officer was informed that a deceased, partially burned female body had been found about midnight in the parking lot of an LA Fitness located a few miles from Lopez's home.

At approximately 5:30 p.m. on July 21, Murrieta Police Officer Steve Whiddon conducted a homicide investigation at the Lopez home. Further evidence was observed and recovered from her home and a surveillance camera at a car wash. David Wu, a serology and DNA analyst for the Department of Justice, also searched the home for blood. Using Luminal and the "Kastle-Meyer test," Wu found drops of blood in a sink in the master bathroom. The drops of blood were most likely caused by a "medium to high energy event," such as a punch or being struck with a heavy object. Wu testified that blood droplets usually come from a person who has been hit with a heavy object twice. The first hit usually breaks the skin and the second hit causes the blood to spray. Wu also found drops of blood in the bathtub about 10 feet away from the bathroom sink. The water in the shower had probably not run, because blood was splattered in it. On the tile floor at the bottom of the stairs, Wu found a blood drag mark which ran between the bottom of the stairs (through a hallway and the laundry room) and the garage. The mark was about a foot wide and 40 feet long. Based on the significant amount of blood at the end of the drag mark, Wu opined that "whatever was there was still bleeding as it was being dragged."

5

Blood found in the trunk of Lopez's Lexus was a mixture of two individuals, Lopez and defendant. The parties stipulated that the blood found on the bottom of the trashcan, the floor of the garage, the trunk of the Lexus, the grout between tiles in the master bathroom floor, and under defendant's fingernails, matched Lopez's DNA.

Lopez's neighbor, Scott Garrett, saw Lopez's Lexus leave her garage sometime between 10:30 p.m. and 11:30 p.m. on July 20, 2007. He noticed the Lexus because it was backed into the garage and he had never seen it parked like that. Joseph Piro, Lopez's ex-fiancé, testified that he had moved out of her home in May. On the evening of July 20, Lopez sent text messages to him, "'Why didn't you fight for me?'" and "'Do you still miss me?'"

Murrieta Police Sergeant Phillip Gomez interviewed defendant on July 21, 2007, at the police station. Noticing a scratch on defendant's neck, Officer Gomez asked defendant to remove his shirt. Defendant's chest had scratches that were bright red and appeared to be fresh. Defendant also had fresh scratches on his shoulder, armpit, forearm, right hand, upper left thigh, and left foot. He had bruises on the inner side of both of his biceps, his left thigh, and his left foot.

On July 24, 2007, defendant met with Dr. Martha Rogers, who asked him to tell her what he remembered about the evening of July 20. The recorded interview was played for the jury. Defendant told Dr. Rogers that he had gotten up on that day and he and Lopez were excited about their date night. Defendant got his car washed that morning and then took it to Big O Tires. He ate lunch and drank beers at Texas Loosey's. Then he went to several bars and continued drinking. Either Lopez called

6

him, or he called her, and defendant learned she was upset. Defendant thought, "crap I'm [in] trouble, I messed up." After stopping with a friend at In-N-Out Burger, defendant arrived home before dark. Lopez was upset at defendant for going out drinking and missing their date. She then went into the master bedroom. The last thing defendant remembered was that she was standing at the sink in the master bathroom, he was sitting on the bed, and Lopez continued to tell him, "[you] can't be drinking, [you] need[] to stop drinking." Defendant remembered apologizing and then blacked out.

When defendant woke up, Lopez was lying on the floor. He shook her but she was unresponsive. He thought someone might be in the house, so he "got down on all fours" and crawled around looking for an intruder. He went back to Lopez knowing he needed to get her to the hospital. Unable to lift her, he grabbed her by her feet and pulled her down the stairs and out to the car in the garage. On the drive, defendant realized that Lopez was dead. He thought, "Oh, my God, what happened? . . . [O]h my god, people are gonna think I killed her. I . . . what happened here? I didn't kill her, I couldn't have killed her. I love her." Defendant remembered a conversation he had with Lopez when they both told each other they wanted to be cremated when they died. So defendant "dropped her off there and . . . tried to . . . cremate her." Then he went home. He thought the whole thing was a nightmare and did not happen.

Defendant told Dr. Rogers the last thing he remembered that night was sitting on the bed apologizing to Lopez for his drinking, while Lopez was in the bathroom. Lopez was mad at him. He remembered feeling groggy and passing out. The next thing he remembered was coming to later that night and seeing Lopez lying on the floor.

7

The partially burned body found behind LA Fitness was identified as Lopez. It was determined that she was deliberately set on fire, and the fire originated in Lopez's pelvic area. She was wearing only shorts. An ignitable liquid was used to start the fire. A plastic dumpster near Lopez's body had also caught on fire and melted, covering Lopez's face completely and making her facial features unrecognizable.

Chief Forensic pathologist Mark Fajardo determined that Lopez was dead when she was set on fire. She had large bruises along the right side of her body and left foot. She also had bruises on her right hand, elbow and foot. Dr. Fajardo opined that a good amount of force had to have been used to cause the kind of bruising. The bruises appeared to have occurred within 24 hours of Lopez's death. The cause of Lopez's death was determined to be "[h]omicidal violence of undetermined etiology." Dr. Fajardo could not determine whether Lopez was strangled, suffocated, drowned, or beaten to death, because she was so badly burned. According to Dr. Fajardo, it would take about a minute either to strangle, suffocate, or drown someone. Given the drag mark, he opined there was a significant amount of blood. After seeing pictures of the scratches on defendant's body, Dr. Fajardo opined they were consistent with fingernail scratches.

Jody Citizen, a senior analyst for Verizon Wireless, reviewed Lopez's cell phone number log, noting several text messages to and from a phone registered to Joe Piro on July 20, 2007. The last message from Lopez sent to Piro's phone was at 8:56 p.m. No other messages were sent from her phone.

8

**B.  The Defense**

Defendant introduced evidence that he was very happy being with Lopez.  Bruno Zvirzin testified he had talked to defendant at 8:40 p.m. on July 20, 2007, and that defendant sounded like he had been drinking and was about to fall asleep or pass out. The next day when Zvirzin talked to defendant, defendant was worried that Lopez had not returned home.

Todd Coomes testified that in 2001 or 2002 when he had been out drinking with defendant, defendant had started yelling profanities.  Defendant yelled that he had to "get out of there" and tried to open the car door on the freeway.  Defendant then punched the windshield and broke it.  The following day, defendant had no recollection of how he had behaved the night before, because he called Coomes asking "'where's my car?'"

Dr. Michael Kania, a clinical forensic psychologist, testified that alcohol can make people become angry if they are in an "angry" environment or one where a person is yelling at them.  Dr. Kania testified that alcohol affects judgment, and people are less likely to use good judgment when they are consuming alcohol.  People are also less inhibited when they are drinking alcohol.  If a person is very intoxicated, he may not give any thought to what he is doing.  Dr. Kania testified that alcohol impairs a person's judgment, perception, and emotional reactions, and these all affect the quality of decision he is making.  A person will often black out when he consumes so much alcohol that the brain is numb and unable to consciously recall things that have happened.

Defendant had been prescribed several medications for depression, mood, and anxiety.  Dr. Kania did not know if defendant had been taking those medications on the

night he killed Lopez.  The doctor testified that a person should not consume alcohol while taking those medications because it would increase the effects of the alcohol.

## C.  Rebuttal

Sergeant Gomez testified that three bottles of prescription drugs were collected from Lopez's home.  One bottle was still sealed, and the other two contained the same amount of pills as had been prescribed.  Defendant was not tested for drugs on July 21, 2007.

## II.  EXCLUSION OF DEFENSE EXPERT TESTIMONY

Defendant contends the trial court erred in precluding his psychiatric expert, Dr. Robert G. Stanulis, from testifying about the "co-morbidity" of alcohol dependence and PTSD, and that defendant suffered from PTSD prior to and at the time he killed Lopez.  He argues that he was deprived of his constitutional right to present a complete defense, along with evidence to support his defense.

## A.  Further Background Information

Prior to trial, defense counsel informed the court that she had reviewed defendant's Veteran's Administration (V.A.) records, which indicated defendant might be suffering from PTSD.  She informed the court that she had retained Dr. Stanulis, a forensic psychologist and neuropsychologist, to evaluate defendant for PTSD. Dr. Stanulis interviewed defendant and prepared a report of his findings, which defense counsel provided to the prosecutor.  According to the report, defendant suffered from PTSD, which was getting worse right before Lopez was killed, and his alcohol consumption was caused by his PTSD.  Defendant had served in the military during

10

Operation Desert Shield and Operation Desert Storm. After 11 years in the Marine Corps he was honorably discharged due to a medical condition. He received treatment for PTSD at the V.A., was given an 80 percent disability rating in July 2006, was observed consuming large amounts of alcohol until he became drunk, and was prescribed various medications.

In his report, Dr. Stanulis stated that he could not "provide an official diagnosis of any mental disease." Rather, the purpose of his report was to explain why defendant used alcohol, namely "to address the symptoms germane to [PTSD]." To that end, Dr. Stanulis concluded: "It is my opinion that in [defendant's] case, his PTSD had worsened in the period just prior to the instant offense, and that the binge drinking on the night of the instant offense was caused by his PTSD. In addition, both the self-report of [defendant] and the descriptions of his behavior earlier in the night do not indicate any malice aforethought. Rather both are consistent with guilt over not being available for date night because he could not manage his PTSD symptoms and binge drinking. While [defendant] is amnesic for the instant offense, it is also notable that he does not deny that he is responsible for the death of his girlfriend and is quite despondent and guilty over this fact. It is also notable that the act of burning the body is quite similar to the traumatic events he described in combat where bodies were burned. This suggests that [defendant's] PTSD was quite symptomatic the night of the instant offense."

Defense counsel sought to call Dr. Stanulis to testify as to the findings in his report. She argued that defendant's V.A. records demonstrated he had suffered from PTSD since 2005, and that the doctor's expert testimony was relevant as to the issue of

11

whether defendant had malice aforethought on the night Lopez was killed, whether defendant intended to kill Lopez, and whether he acted with premeditation and deliberation when he killed Lopez. Defense counsel indicated that Dr. Stanulis would testify that PTSD was what had caused defendant's excessive consumption of alcohol; that he drank and took medication together; that PTSD and excessive alcohol consumption are interrelated; and that the symptoms such as flashbacks and nightmares subside when someone with PTSD consumes alcohol. Thus, counsel argued the alcohol consumption was caused by the mental disease or defect that is PTSD, and that it was involuntary.[2] In support of her argument, she cited former section 22, subdivision (b),[3] and section 28, subdivision (a).[4]

---

[2] "Dr. Stanulis . . . will testify that [defendant] does suffer from PTSD and did suffer from PTSD on the day of this incident. And then I think it's up to the jury to decide, based on his testimony . . . if the PTSD had an effect on his mental state . . . . [¶] And then the next step would be because he has PTSD, that's why he drinks so much. . . . And they're so interrelated, the PTSD and the alcohol. We can't just say this is a man who is just an alcoholic and he goes out and drinks and parties with his buddies. No. He has to drink because of his PTSD, because they subside his nightmares, because it subsides his anxiety. [¶] And then, of course, it is up to the jury on the intoxication issue whether or not they believe his intoxication affected his mental state at the time of the incident, if it affected malice as well, as well as premeditation and deliberation. But the two are so interrelated that to separate one from the other—it doesn't make sense. It doesn't explain why [defendant] has to drink as much as he has to drink. And that is because of the PTSD."

[3] "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Former § 22, subd. (b) (renumbered § 29.4, subd. (b), as amended by Stats. 2012, ch. 162, § 119, eff. Jan. 1, 2013).)

[4] "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not

*[footnote continued on next page]*

12

The prosecution objected to the testimony on the grounds it was irrelevant and evidence of diminished capacity. The prosecution argued that involuntary intoxication amounted to irresistible impulse evidence, which is inadmissible under *People v. Wyatt* (1972) 22 Cal.App.3d 671, and that PTSD is not really different from the involuntary intoxication argument. Given defendant's lack of memory, the prosecution claimed that evidence of PTSD was irrelevant. In reply, defense counsel argued that defendant's lack of memory went to the heart of PTSD, because flashbacks and blackouts are part of the mental disease or defect.

After considering the written and oral arguments of the parties, the applicable statutes and case law, including *People v. Coddington* (2000) 23 Cal.4th 529, 582-584 [summary of permissible and impermissible expert testimony on mental state evidence in criminal trial], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, the court ruled: "The defense, of course, points out that the really important issue pertains to a mental condition caused by the [PTSD]. It's difficult for me to find a causal connection between the [PTSD], if it exists, and the defendant's conduct. Now, the intoxication might have and might not have, I don't know, depending upon the evidence, a causal connection to the alleged conduct attributed to the defendant. But I don't see how the PTSD does have that causal connection. I believe the key issue might

*[footnote continued from previous page]*
limited to . . . premeditation, deliberation, or malice aforethought . . . Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).)

13

be not the cause of why he was in a certain condition, but the effect, if any. And the effect, I think, is not the PTSD, but the intoxication itself.

"The cause of the reasons for defendant's intoxication—I don't see the relevance of that. The probative value appears to be not that strong in light of any reasonable connection to this incident. So the PTSD—I just don't see it. I do not find it to be relevant to the alleged conduct. The [PTSD] evidence—I see it as irrelevant. I am going to exclude that.

"Expert testimony that the defendant lacked the capacity to form any prerequisite specific intent I believe is beyond the scope of what an expert is allowed to testify to based upon statutory law and case law. So the doctor would not be allowed to testify regarding the [PTSD] or forming any opinion regarding capacity or lack thereof to do certain things."

Later on, the trial court added that Dr. Stanulis could "testify as to the effects alcohol might have on somebody. He could testify as to the effects of alcohol on certain medications. He could talk about the medications. Not about the [PTSD]. But he could say if a person is taking this medication and consumes alcohol, here is what one might anticipate. There is no way he could testify as to this defendant lacking capacity to form any specific intent, any deliberation in the mind of the defendant, any malice by the defendant. But he could testify in general here is what he anticipates might occur. He cannot testify that, 'The defendant told me that he drinks a certain amount,' or 'Here is a report or medical record stating he drinks a certain amount,' or 'He overindulges in drinking' or 'overdoses the prescription meds that he is on.' That would not be relevant.

14

But he could testify of his opinion as to the impact in general of certain drugs mixed with alcohol or the alcohol itself.

"As far as this defendant being able to remember a specific intent, certain motivation, able to deliberate, forming malice aforethought—those he could not testify to.

"Okay. The other issue that's been brought up—the involuntary intoxication—it appears to the Court to put forth before the jury that one with [PTSD]—which I am not allowing in, anyway—but with a disorder that that person might become intoxicated based upon the disorder, therefore becoming involuntarily intoxicated, I believe is contrary to any law that I have been made aware of. It would be unduly confusing and misleading to the jury.

"We have jury instructions CALJIC 4.22, 4.23. They define voluntary intoxication. They define involuntary intoxication. To start talking about something else that might be contrary to those jury instructions—I think that would be so misleading, so confusing. He would not be allowed to testify as to involuntary intoxication."

Later, defense counsel renewed her request to introduce expert testimony regarding defendant's PTSD diagnosis, citing *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*).[5] She argued that allowing evidence of intoxication without the PTSD was

---

[5] She stated: "As the Court is aware, we were asking for a doctor to be able to testify as to my client having [PTSD] as a defense in this case to go toward mental disease or defect which would go towards the—to negate the malice aforethought, the premeditation, and deliberation that is required to be proved in this case. [¶] . . . .[¶] . . . Because the jury does not get to hear the whole story of what was going through [defendant's] mind—well, obviously, the expert cannot testify what was going through

*[footnote continued on next page]*

15

incomplete, denying the jury of the "whole story" regarding defendant's mental condition which would create the danger of the jury using the evidence to find that he was a "loser alcoholic person." Incorporating its prior ruling, the trial court stated that "the probative value does not appear to be that strong that [PTSD] caused this defendant to act in the way alleged by the prosecution. Might be a valid defense that it's the alcohol abuse that perhaps caused the defendant to act in the way alleged by the prosecution, and, of course, alcohol evidence would be admitted. It's allowed. The jury could consider whether this is voluntary manslaughter. It would be up to them. But [PTSD]—I am not going to allow that testimony in for the reasons stated before."

## B. Standard of Review

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion. [Citation.]" (*People v. Vieira* (2005) 35 Cal.4th 264, 292.)[6]

---

*[footnote continued from previous page]*
his mind—but what he suffered mental condition-wise was the PTSD and because he has the PTSD he has to—he drinks in order to not have nightmares and that the two were correlated. I understand the Court is allowing me to go into intoxication, but still I would argue first to allow it in as a mental disease or defect defense and then, second, if not, to allow it in to at least explain to the jury what was going on in this guy's world. He's not just an alcoholic that goes to a bar every day and drinks, doesn't care about life, doesn't work, lives off a woman. He has been diagnosed with PTSD, and it gets worse. The only way he makes himself better is when he drinks alcohol so he doesn't have the nightmares which would explain why he drinks to the jury, so they don't have this view of this man as just being this loser alcoholic person."

   [6] During oral argument, defendant's counsel argued that the abuse of discretion standard of review is insufficient in this case because the denial of the introduction of Dr. Stanulis's expert testimony amounted to denying defendant his right to present a defense. We disagree. A criminal defendant's federal constitutional right to present a defense is not violated by "exclusion of expert testimony on the ultimate question of fact as to whether [defendant] did form those mental states . . . ." (*People v. Coddington*, *supra*, 23

*[footnote continued on next page]*

## C. Analysis

"Our analysis of the trial court's ruling necessarily starts with the plain language of sections 25, 28 and 29. Sections 25 and 28 *do* prohibit the admission of evidence of the defendant's 'intoxication, trauma, mental illness, disease, or defect' if its purpose is 'to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged' [citation] or 'with which the accused committed the [crime]' [citation], or 'required . . . for the crimes charged' [citation]. In other words, the defendant cannot put on an expert to testify that, because of his mental disorder or condition (for example, dissociation, or PTSD), he or she did not have the ability, or capacity, to form or harbor whatever mental state is a required element of the charged offense, such as intent to kill, or malice aforethought, or premeditation, or deliberation.

"On the other hand, such evidence *is* admissible for the sole purpose of showing ('solely on the issue of') 'whether or not the accused actually formed a required specific intent, premeditated, deliberated or harbored malice aforethought, when a specific intent crime is charged' [citation], except that an expert who testifies 'about a defendant's

*[footnote continued from previous page]*
Cal.4th at p. 583.) While "[t]he complete exclusion of defense evidence . . . '"theoretically could rise to [the] level"' [citation] of a due process violation[,] . . . short of a total preclusion of defendant's ability to present a mitigating case to the trier of fact, no due process violation occurs; even '"[i]f the trial court misstepped, '[and its] ruling was an error of law . . . [and] there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.'"' [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 452-453.) Here, the trial court merely rejected some evidence concerning the defense, namely, evidence that defendant's PTSD caused him to kill Lopez. According to the trial court, defendant was in "a certain condition" because of his intoxication, not his PTSD.

17

mental illness, mental disorder, or mental defect' (for example, dissociation or PTSD) 'shall not testify as to whether the defendant did or did not have the required mental states . . . for the crimes charged.' [Citation.] In other words, the defendant *can* call an expert to testify that he had a mental disorder or condition (such as PTSD or dissociation), as long as that testimony tends to show that the defendant did or did not in actuality (as opposed to capacity) have the mental state (malice aforethought, premeditation, deliberation) required for conviction of a specific intent crime (as opposed to a general intent crime) with which he is charged, except that the expert cannot offer the opinion that the defendant actually did, or did not, harbor the specific intent at issue. Put differently, sections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged." (*Cortes*, *supra*, 192 Cal.App.4th at p. 908.)

In *Cortes*, the defendant stabbed the victim 13 times during an altercation at a party. (*Cortes*, *supra*, 192 Cal.App.4th at p. 877.) The defendant had a history of fighting, and when he was 12 or 13, he suffered a traumatic event at the hands of his mother's abusive boyfriend, which left him feeling "trapped." (*Id*. at pp. 884-885, 886.) The defendant attempted to introduce psychiatric evidence via Dr. Harvey Dondershine, who was retained to render an opinion about defendant's likely mental state at the time of

18

the stabbing. (*Id.* at p. 891.) The trial court ruled that "Dr. Dondershine could testify about dissociation and post-traumatic stress disorder in general, but could not testify about defendant's mental condition at all." (*Ibid.*) On appeal, the appellate court found reversible error, holding that the trial court's ruling was unduly restrictive and erroneous, preventing the expert from testifying about his assessment of the defendant's psychiatric background and experiences, as well as about how those experiences could have affected his perceptions during the altercation with the victim. (*Id.* at p. 909, 911-912.) The error was prejudicial in that it "effectively eviscerated any defense defendant had to premeditated and deliberated murder. By prohibiting any testimony about defendant's mental condition, the court's ruling robbed Dr. Dondershine's testimony of any relevance it might otherwise have had, since it left the jury no basis to infer that defendant had lapsed into a dissociated state in which he might not have deliberately premeditated the infliction of 13 wounds on the victim. The court's ruling also prevented the jury from properly evaluating evidence that would have been relevant to its consideration of the self-defense, imperfect self-defense and heat of passion instructions given here." (*Id.* at p. 912.)

Here, defense counsel sought to introduce Dr. Stanulis's testimony regarding defendant's PTSD and its connection to his alcohol consumption, i.e., because of his PTSD defendant was compelled to drink excessively. However, the fact that defendant's PTSD caused him to drink was irrelevant. This case is not like the facts in *Cortes*. In *Cortes*, the expert was prevented from testifying about defendant's psychiatric background and experiences and how those experiences may have affected his

19

perceptions during his assault on the victim. (*Cortes*, *supra*, 192 Cal.App.4th at p. 909, 911-912.) Here, it was not defendant's PTSD that affected his perceptions and actions during his assault of Lopez. Rather, it was the fact that he was drunk.

During oral argument, defendant's counsel insisted that Dr. Stanulis should have been allowed to testify that defendant suffered from PTSD, which is a mental disease or defect which goes directly to the intent, premeditation, deliberation, and malice aforethought. However, as the People point out, defendant claimed to have no memory of what happened or what, if anything, precipitated Lopez's death. Defendant told Dr. Rogers and Officer Whittington that he had passed out, and when he woke up Lopez was dead. There is no basis for any opinion that defendant was suffering from PTSD during the time of the assault. Defendant did not claim he was experiencing some sort of uncontrollable rage or flashback. There was no evidence of any triggering event which would have set off an uncontrollable rage that defendant could not overcome. Defendant told Officer Whittington there was no yelling or physical act of violence. He told Dr. Rogers that Lopez was upset because he had been out drinking and missed their date night. He thought, "crap I'm [in] trouble, I messed up." The last thing defendant remembered was that she was standing at the sink in the master bathroom, he was sitting on the bed, and Lopez continued to tell him that he could not be drinking. He apologized and blacked out.[7] Because there was no evidence of any kind of uncontrollable rage, the

---

[7] During oral argument, counsel for the People pointed out that while defendant was sitting on the bed when Lopez was in the bathroom telling him he could not drink, he clearly must have gotten up off the bed and went into the bathroom to kill her because that is where significant blood splatter was found.

fact that defendant suffered from PTSD was irrelevant. The key evidence was the fact that defendant had been drinking. Evidence of defendant's alcohol consumption was presented to the jury. The jury heard about defendant's prior drinking episodes, how he acted, and the fact that he did not recall his actions while drunk. Further, the jury was instructed with a modified version of CALJIC No. 4.21.1, which provided in part: "[Y]ou should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent, or premeditated, or deliberated, or harbored express malice aforethought at the time of the commission of the alleged crime. [¶] . . . [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether, or not, defendant had the required specific intent, or premeditated, or deliberated, or harbored express malice aforethought." Thus, the jury was not precluded from considering defendant's mental condition in deciding whether he actually formed the requisite intent. (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1450.) Accordingly, the trial court did not err in excluding the expert testimony regarding PTSD.

### III. SUFFICIENCY OF EVIDENCE

Defendant contends substantial evidence does not support the jury's finding that he acted with deliberation and premeditation, because no evidence of planning or motive was presented and there was nothing exacting about the manner by which he killed Lopez.

21

**A. Standard of Review**

"Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation. . . . Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. [Citations.] The standard of review is the same in cases such as this where the People rely primarily on circumstantial evidence. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).)

Our review of any claim of insufficiency of the evidence is therefore a limited review. If the evidence presented to the trial court is subject to differing inferences, the reviewing court must assume that the trier of fact resolved all conflicting inferences in favor of the prosecution. (*Jackson v. Virginia* (1979) 443 U.S. 307, 326.) A reviewing court is precluded from making its own subjective determination of guilt or innocence. (*Id*. at p. 319, fn. 13.)

In *Perez*, *supra*, 2 Cal.4th at page 1127, our Supreme Court emphasized: "[T]he relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that defendant premeditated the murder. [Citations.]"

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Given this court's limited role on appeal, defendant bears a heavy burden in claiming there was insufficient evidence to sustain his conviction for first degree murder. If the verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact and not retry the case ourselves. "'On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence. (*People v. Barnes* (1986) 42 Cal.3d 284, 303.)

Defendant's hurdle to secure a reversal is just as high when the prosecution's case depends on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) "'"'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.]" (*Id*. at p. 793.)

23

**B. Analysis**

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187.) To prove one variety of first degree murder, the prosecution must show a willful, deliberate and premeditated killing. If it fails to do so, the murder is a second degree murder. (§ 189.) A killing is deliberate and premeditated if the killer weighs and considers the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to and does kill. (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.) "'''The true test is not the duration of time [of reflection] as much as it is the extent of the reflection.'''" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

"'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]"' [Citation.]

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [(*Anderson*)], [our state's highest] court reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] We described three categories of evidence recurring in those cases: planning, motive, and manner of killing. [Citations.] The *Anderson* decision stated: 'Analysis of the cases will show that this court sustains verdicts of first degree

24

murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [ motive] in conjunction with [evidence of] either [planning] or [manner of killing].' [Citations.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419-420.)

In *People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*), the California Supreme Court pointed out the three categories provide "one framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation." The high court has further cautioned that the *Anderson* categories are only a set of "guidelines" for analysis. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32 ["[w]e have recently explained that the *Anderson* factors do not establish normative rules, but instead provide guidelines for our analysis"], overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In particular, the court has emphasized that the three categories themselves do not constitute a substitute for, or a rewriting of, the actual elements of first degree murder. (*People v. Prince* (2007) 40 Cal.4th 1179, 1253; *People v. Halvorsen*, *supra*, 42 Cal.4th at p. 420.)

*Solomon's* discussion of premeditation and deliberation emphasizes the extent of reflection on the decision to kill: "Defendant overlooks a core principle that has guided appellate courts in assessing the sufficiency of the evidence of premeditation and deliberation for over 60 years: 'The true test is not the duration of time as much as it is the extent of the reflection.' [Citations.]" (*Solomon*, *supra*, 49 Cal.4th at pp. 812-813.) The speed by which such reflection takes place may not be as short as the flicker or twinkling of an eye. (See *id*. at p. 829.) But premeditation and deliberation are present if

25

the jury could find a sufficient extent of reflection on the decision to kill. (See *id*. at pp. 812-813.)

In *Perez*, *supra*, 2 Cal.4th at p. 1122, there was sufficient evidence of premeditation and deliberation where the court held that defendant's entering a house and obtaining a steak knife from a kitchen was properly indicative of planning activity, even in the case of brutal and frenzied knife attack. In *People v. Lewis* (2009) 46 Cal.4th 1255, the court said the "additional act" of slashing the victim's throat after the victim had been "strangled to the point of unconsciousness" was "'indicative of a reasoned decision to kill.'" (*Id*. at p. 1293.) In *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102, the victim's effort to retreat, posing no threat, offered evidence of premeditation and deliberation.

In the present case, defendant argues there is no evidence of his planning activity, given the fact that he was in a loving relationship with Lopez, it was their date night, he came home inebriated, he had no weapons, did not lure Lopez somewhere to ambush her, and "had not set the stage for any type of murder." In response, the People point out that Lopez had been texting her ex-fiancé that evening, asking if he missed her, and defendant claimed he only had a "buzz" when he came home. Thus, the People argue the jury could have reasonably inferred that defendant had read the texts on Lopez's phone as evidenced by the fact that he got rid of the phone, was upset that Lopez was renewing or wanted to renew her relationship with her ex-fiancé, and he decided to kill her. The jury could infer that defendant was jealous and angry that Lopez was texting her ex-fiancé. Defendant's question to Garrison about whether Lopez was cheating on him suggests he was worried

26

that she would leave him. It is reasonable to infer that defendant wanted to stop her from leaving or punish her for even thinking about it. There were tools in the hallway outside the master bedroom that defendant could have used to remove the baseboard in the master bathroom, to use as a weapon or because it was too bloody to be cleaned. The presence of blood droplets evidences a person being hit with a heavy object twice. The first hit breaks the skin and the second hit causes the blood to spray. Further, there was a trail of blood (drag mark) that followed the path defendant took to remove Lopez's body. Fajardo testified Lopez must have bled a significant amount to leave such a large, consistent drag mark. More importantly, all of Lopez's injuries occurred near her waist, suggesting a deliberate effort to target her vital organs.

The People further assert the evidence shows it was unlikely the attack on Lopez was the cause of her death. According to Dr. Fajardo, while Lopez had not suffered any broken bones, she may have been suffocated, strangled, or drowned. The jury could have inferred that when defendant's assault on Lopez did not kill her, he then suffocated, strangled, or drowned her. As such, defendant had time to reflect and plan any of these acts given the time it would have taken to accomplish them. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020 ["prolonged manner of taking a person's life . . . affords ample time for the offender to consider the nature of his deadly act"].)

Finally, defendant' behavior after he killed Lopez provides evidence of premeditation and deliberation. After dragging her body from the house, defendant put

27

Lopez in her car in the garage, drove to the LA Fitness parking lot, doused her with a flammable liquid, set her on fire, and left her burning body. Defendant returned home to clean up the house. He never sought medical attention or help for Lopez. In between cleaning up the evidence of his attack, defendant retrieved his car, went to a meeting at school, and took a nap. He continually lied to others, claiming he did not know Lopez's whereabouts. And he appeared to be nervous, not overwrought with emotion.

Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could find defendant acted with premeditation and deliberation.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


                                                    HOLLENHORST
                                                            Acting P. J.
We concur:

        RICHLI
                        J.

        MILLER
                        J.